# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| EURIE A. STAMPS, JR. and NORMA BUSHFAN-STAMPS, Co-Administrators of the Estate of Eurie A. Stamps, Sr., | ) ) ) ) | |
| | ) | **Civil No.** |
| **Plaintiffs,** | ) | **12-11908-FDS** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **TOWN OF FRAMINGHAM and PAUL K. DUNCAN,** | ) ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

_____)

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (CORRECTED)

**SAYLOR, J.**

This is a civil rights action arising out of the shooting of an individual during the execution of a search warrant. On January 5, 2011, Eurie Stamps, Sr., was shot and killed in his home by defendant Paul Duncan, an officer of the Framingham Police Department. Plaintiffs Eurie Stamps, Jr., and Norma Stamps are the co-administrators of the elder Stamps's estate. They have brought suit on behalf of the estate against Duncan and the Town of Framingham, alleging violations of the constitutional rights of the elder Stamps under 42 U.S.C. § 1983, and wrongful death under the Massachusetts Torts Claims Act, Mass. Gen. Laws ch. 258, § 2.

Defendants have moved for partial summary judgment. For the following reasons, the motion will be granted in part and denied in part.

# I.    Background

## A.    Factual Background

The following facts are undisputed unless otherwise noted.

On January 5, 2011, the Framingham police department executed a search warrant on a first-floor apartment at 26 Fountain Street.  (Def. SMF ¶ 7).  Eurie Stamps, Sr., a 68-year-old retired MBTA maintenance worker, resided in the apartment with his wife Norma and his stepson Joseph Bushfan.  (Def. SMF ¶ 5; Pl. SMF ¶ 1).

The search arose out of a report that Bushfan and others were selling crack cocaine from the apartment.  (Def. SMF ¶ 2).  Framingham police detectives believed that Bushfan and two other males in the apartment had violent criminal histories and affiliations with Boston gangs. (Def. SMF ¶ 3; Pl. SMF ¶ 2; Duncan Dep. 19-21).

The Framingham police did not suspect Stamps of any crime.  He did not have a history of violence.  The SWAT team was informed that he posed no known threat to police during the execution of the warrant.  (Pl. SMF ¶¶ 2, 6-7; *see* Duncan Dep. 21-25).

Officer Paul Duncan was one of approximately eleven SWAT team members that raided the apartment.  (Def. SMF ¶ 1; Pl. SMF ¶ 4).  He entered the apartment through the front door. (Def. SMF ¶ 8).  He was carrying a loaded M-4 rifle.  After entering the apartment, he moved the selector switch of his rifle from "safe" to "semi-automatic."  (Def. SMF ¶ 9).[1]

During the search of the apartment, two officers encountered Stamps in a hallway that connected the kitchen to the bathroom and a rear bedroom.  They ordered him to "get down." (Def. SMF ¶ 14; Pl. SMF ¶ 20).  Stamps complied with the order and lay on his stomach with his

---

[1] When the gun is in "safe" mode, it cannot be fired.  (Pl. SMF ¶ 36).

hands near his head.  (Def. SMF ¶ 15).  The officers who had ordered Stamps into this position

left him to investigate other rooms.  (Def. SMF ¶¶ 18-19; Pl. SMF ¶ 21).

Duncan was ordered to go to the kitchen.  Once there, he encountered Stamps lying on

the floor on his stomach in the hallway outside the kitchen.  (Def. SMF ¶¶ 12-13, 20; Pl. SMF ¶¶

22-25).  While the other SWAT members continued the search of the apartment, Duncan

approached Stamps and pointed his rifle at him.  (Def. SMF ¶¶ 21-22).  Duncan contends that he

did so, with the rifle's selector switch still in its "semi-automatic" position, for the purpose of

protecting himself and sending a message that Stamps should not move or do anything

threatening.  (Pl. SMF ¶ 28; Duncan Dep. 72-76).  At some point, Duncan put his index finger

inside the trigger guard and on the trigger.

While Duncan was pointing the rifle at Stamps, he pulled the trigger.  The shot hit

Stamps in the face.  (Def. SMF ¶ 27; Pl. SMF ¶ 32).  Stamps died as a result of the shot.  (Def.

SMF ¶ 36).

At no point did Stamps do or say anything to suggest that he was a threat to the police or

anyone else, or to suggest that he was not cooperating.  The parties agree that Duncan did not

intend to pull the trigger or injure Stamps.

According to plaintiffs' expert, Duncan's failure to keep the rifle's safety engaged and

his placement of his finger on the trigger contravened safe firearm-handling procedures.  (Def.

SMF ¶¶ 37, 39; Pl. SMF ¶ 40).  Defendants concede that by placing his finger on the trigger,

Duncan did not comply with Framingham police officer training or protocols.  (Def. SMF ¶¶ 38,

43).

## B.    Procedural Background

On October 12, 2012, Eurie Stamps, Jr., and Norma Stamps filed the complaint in this case.  The amended complaint alleges section 1983 violations by Duncan predicated on Fourth and Fourteenth Amendment violations; a section 1983 violation by the Town of Framingham predicated on negligent training; a state law claim against Duncan for wrongful death; and two counts of wrongful death in violation of Massachusetts law against the Town of Framingham.

Defendants have moved for partial summary judgment as to nine of the ten counts.[2]  They contend that (1) Duncan's unintentional firearm discharge cannot violate a constitutional right; (2) that Duncan's decision to introduce the firearm into the encounter with Mr. Stamps was objectively reasonable; and (3) Duncan is entitled to qualified immunity because a constitutional right to be free from unintentional shootings was not clearly established at the time of the incident.

## II.    Standard of Review

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation marks omitted).  Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

_____

[2] Defendants have not moved for summary judgment on Count 9 against the Town of Framingham for wrongful death under the Massachusetts Torts Claims Act, Mass. Gen. Laws ch. 258 § 2, predicated on Duncan's negligence.

bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In making that determination, the court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009). When "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

## III.  Analysis

### A.  Claims Against Duncan

#### 1.  Section 1983

Section 1983 is a vehicle for vindicating substantive rights conferred by the Constitution or laws of the United States that have been violated by persons acting under color of state law. *See Graham v. Connor*, 490 U.S. 386, 393-94 (1989); *Albright v. Oliver*, 510 U.S. 266, 315 (1994). Here, it is not disputed that Duncan is a state actor being sued for actions taken pursuant to his official duties; the sole issue is whether his actions deprived Stamps of his constitutional rights. The complaint identifies both the Fourth Amendment and the Fourteenth Amendment Due Process Clause as the source of the substantive rights allegedly infringed by Duncan. The constitutional claim is based on the use of excessive force.

### a.      Fourth Amendment (Counts 1-4)

Counts 2 and 3 allege Fourth Amendment violations based on the use of excessive force.[3] The Fourth Amendment guarantees the right "to be secure . . . against unreasonable searches and seizures." Defendants deny that Duncan's action constitutes a violation of the Fourth Amendment and contend that, to the extent that he did infringe Stamps's constitutional rights, he is entitled to qualified immunity.

The doctrine of qualified immunity protects public employees "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is determined according to a two-part test. *Pearson v. Callahan*, 555 U.S. 223 (2009); *Maldonado v. Fontanes*, 568 F.3d 263, 268-69 (1st Cir. 2009). Under *Pearson* and *Maldonado*, the relevant inquiries are (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of defendant's alleged misconduct. *Pearson*, 555 U.S. at 224; *Maldonado*, 568 F.3d at 269. Although conducting this two-step analysis in sequence is sometimes advisable because doing so "promote[s] the development of constitutional precedent," courts have discretion to avoid the direct constitutional question when a matter may be resolved at the second step. *Maldonado*, 568 F.3d at 269-70.

---

[3] Count 1 relies on allegations that officer Duncan intentionally used deadly force during the course of the seizure. However, the parties agree that Duncan's shooting of Stamps was accidental. Summary judgment as to Count 1 will therefore be granted. Counts 2 and 3 will be analyzed together as a claim for excessive force. Count 4 appears to be a claim for Fourth Amendment violations based on an unlawful search. However, the undisputed facts indicate that the warrant and search were authorized by law, and plaintiffs do not appear to have put forth any facts to create a genuine issue of material fact with respect to Count 4. Summary judgment will therefore be granted as to Count 4.

**(1)    Alleged Violation of a Constitutional Right**

In order to establish a Fourth Amendment claim based on excessive use of force, the plaintiff must show (1) that there was a "seizure" within the meaning of the Fourth Amendment; and (2) that the use of force during the seizure was unreasonable under all circumstances. *Graham*, 490 U.S. at 394; *Bastien v. Goddard*, 279 F.3d 10, 14 (1st Cir. 2002).  A "seizure" within the meaning of the Fourth Amendment occurs "only when there is a governmental termination of freedom of movement *through means intentionally applied*."  *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989).  The governmental termination of freedom of movement can occur "by means of physical force or show of authority."  *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968); *see also United States v. Mendenhall*, 446 U.S. 544, 554 (1980) ("Examples of circumstances that might indicate a seizure . . . would be . . . the display of a weapon by an officer . . . .").  The relevant inquiry is whether the officer intended to acquire control over a specific individual.  *See Landol-Rivera v. Cruz Cosme*, 906 F.2d 791, 794-95 (1st Cir. 1990) (explaining that the restraint of liberty must result from an attempt to gain control over an individual).

Here, the undisputed facts show that officer Duncan intentionally pointed his rifle at Stamps as a show of authority in order to assume control over him.  (DSMF ¶¶ 21-22).  Stamps was therefore unquestionably seized, and remained under seizure at all relevant times.  The question, then, is whether the use of force during the seizure was reasonable under the circumstances.

All claims of excessive force must be judged by an "objective reasonableness" standard. *Graham*, 490 U.S. at 397.  The reasonableness of the force is determined by a "careful

balancing" of the level of force used with the countervailing governmental interests at stake.  *Id.*
at 396.  The reasonableness of the force may not be judged with the benefit of hindsight, but
from "the perspective of a reasonable officer on the scene."  *Id.*  The objective reasonableness of
the force used is determined by means of a balancing test that considers, among other things, the
severity of the suspected offense, whether the suspect poses an immediate threat to the officer
and others, and whether the suspect is actively resisting arrest or attempting to evade arrest by
flight.  *Id.*; *see also Bastien*, 279 F.3d at 14.

The officer's subjective intent or motivation is not relevant to the reasonableness inquiry.
*Bastien*, 279 F.3d at 14 (citing *Alexis v. McDonald's Rests.*, 67 F.3d 341, 352 (1st Cir. 1995)).
"An officer's evil intentions will not make a Fourth Amendment violation of an objectively
reasonable use of force; nor will an officer's good intentions make an objectively unreasonable
use of force constitutional."  *Graham*, 490 U.S. at 397.

The intentional use of deadly force during a seizure is unconstitutional unless the officer
has probable cause to believe that the suspect poses a significant threat of death or serious
physical injury.  *Tennessee v. Garner*, 471 U.S. 1, 3 (1985).  Even the unintentional or accidental
use of deadly force in the course of an intentional seizure may violate the Fourth Amendment if
the officer's actions that resulted in the injury were objectively unreasonable.  *See Brower*, 489
U.S. at 599; *Landol-Rivera*, 906 F.2d at 796 (explaining that unintentional conduct may trigger
Fourth Amendment liability "when a police officer accidentally causes more severe harm than
intended to an individual").

Here, it is undisputed that Duncan fired his weapon by accident, not intentionally.
Multiple courts have concluded or at least suggested that the accidental firing of a weapon in the

course of an intentional seizure can give rise to an excessive force claim under the Fourth Amendment. *See, e.g., Henry v. Purnell* ("*Henry II*"), 652 F.3d 524 (4th Cir. 2011) (en banc) (fleeing suspect shot when officer mistakenly fired handgun instead of Taser); *Watson v. Bryant*, 532 Fed. Appx. 453 (5th Cir. 2013) (arrestee accidentally shot during attempted handcuffing); *Tallman v. Elizabethtown Police Dept.*, 167 Fed. Appx. 459 (6th Cir. 2006) (suspect accidentally shot when officer reached into vehicle); *Pleasant v. Zamieski*, 895 F.2d 272 (6th Cir. 1990) (gun accidentally discharged when officer grabbed suspect)*; McCoy v. City of Monticello*, 342 F.3d 842 (8th Cir. 2003) (suspect shot when officer fell on ice and gun accidentally discharged); *Torres v. City of Madera*, 524 F.3d 1053 (9th Cir. 2008) (arrested suspect in patrol car shot when officer mistakenly fired handgun instead of Taser); *Speight v. Griggs*, 13 F. Supp. 3d 1298 (N.D. Ga. 2013) (suspect accidentally shot while being subdued and handcuffed), *vacated in part on other grounds*, 579 Fed. Appx. 757 (11th Cir. 2014).

The relevant inquiry is not whether Duncan intended to injure Stamps, and thus whether it was an accidental or an intentional shooting; the officer's subjective intent is not the issue. Instead, it is whether Duncan's conduct leading up to the discharge of the gun was objectively reasonable under the circumstances. *See, e.g., Watson*, 532 Fed. Appx. at 457-58 (finding that an undisputedly accidental shooting can lead to Fourth Amendment liability if the officer "acted objectively unreasonably by deciding to make an arrest, by drawing his pistol, or by not reholstering it"); *Tallman*, 167 Fed. Appx. at 463-66 (focusing reasonableness inquiry on officer's actions leading up to unintentional discharge of the weapon); *McCoy*, 342 F.3d at 848 ("[T]he relevant inquiry is not whether [officer's] act of firing his gun was 'objectively reasonable,' but whether, under the totality of the circumstances, the act of drawing the gun was

'objectively reasonable.'"); *Pleasant*, 895 F.2d at 276 (explaining that the relevant inquiry is whether officer's decision to draw gun at scene and decision to not return gun to holster were reasonable).

It is undisputed that Duncan entered the apartment with his gun drawn, moved the safety from "safe" mode to "semi-automatic," pointed the weapon at Stamps, and placed his finger inside the guard on the trigger. He then shot him in the head, albeit unintentionally. Although there is apparently no issue with respect to the reasonableness of drawing the weapon, there are substantial issues as to the reasonableness of Duncan's conduct as a whole.

First, Stamps posed no actual threat. He was an elderly man. There was no struggle of any kind when the police encountered him. He immediately cooperated with the police and lay down on this stomach, with his hands visible. He made no movement or sound of any kind to indicate any type of resistance, force, or flight.

Second, Stamps was not a suspected threat. The police were not surprised by his presence at the scene (which was his own home). He was not a criminal suspect. He had no history of violence. Indeed, the police officers had been told that Stamps posed no known threat to the police.

Third, the potential harm posed to Stamps from the form of restraint used by Duncan was high—indeed, extremely high. Duncan did not use his hands, or a nightstick, or a chokehold. He did not restrain Stamps with handcuffs. Instead, he pointed a semi-automatic firearm in apparent close proximity to Stamps's head. The likely harm to Stamps, should a misstep occur, was not a mere bruise or broken bone, but death or serious injury.

Fourth, Duncan's intentional actions greatly increased the risk of accidental harm. By

turning off the safety and putting his finger on the trigger, he created the very real possibility that any bump or jolt—or nervous twitch—would result in Stamps's death.[4]

Fifth, there was no obvious justification or need for Duncan to have turned off the safety and put his finger on the trigger, inside the trigger guard.  The placement of his finger apparently violated police department policy, and possibly proper police practice.  *See Sorenson v. McLaughlin*, 2011 WL 1990143, at * 6 (D. Minn. 2011) (officer's placement of finger inside trigger guard that led to accidental shooting violated police training).  There is no reason to believe that Duncan could not have quickly moved the safety, and put his finger inside the guard, had any actual threat materialized.

Under the circumstances, a reasonable jury could find that Duncan's actions leading up to the shooting were objectively unreasonable, and therefore that he employed excessive force in violation of the Fourth Amendment.

### (2)    <u>Clearly Established Law</u>

Defendants contend that even if a jury could find an unreasonable seizure giving rise to an excessive force claim, Duncan is nonetheless entitled to qualified immunity.  For purposes of the second step of the qualified-immunity analysis, "[a] right is clearly established only if it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Soto-Torres v. Fraticelli*, 654 F.3d 153, 158 (1st Cir. 2011).  Put another way, the court must determine "[1] whether the contours of the right, in general, were sufficiently clear, and [2] whether, under the specific facts of the case, a reasonable defendant would have understood that he was violating the right."  *Ford v. Bender*, 768 F.3d 15, 23 (1st Cir. 2014)

---

[4] Defendants concede that Duncan did not comply with police protocol by placing his finger on the trigger. The parties dispute whether switching off the safety contravenes safe firearm-handling procedures.

(citing *Maldonado*, 568 F.3d at 269). Although a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011).

The inquiry starts by "defining the right at issue at 'an appropriate level of generality.'" *Hunt v. Massi*, __ F.3d __, No. 14-1379, slip op. at 10 (1st Cir. Dec. 10, 2014). "The clearly established inquiry must be undertaken 'in a more particularized, and hence more relevant, sense.'" *Id.*, slip op. at 11 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). The court "must analyze whether the law is clearly established 'in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

As a starting point, it was clearly established at the time of the incident that the unintentional or accidental use of deadly force during a seizure can give rise to a constitutional violation if the officer has acted unreasonably in creating the danger. In *Brower*, the Supreme Court made that point clear. There, the police had set up a roadblock intending to capture (but not kill) a fleeing felon; the roadblock was situated behind a curve, at night, and a police vehicle was positioned so that its headlights would shine at the oncoming driver. 489 U.S. at 594. Brower drove into the roadblock at high speed and was killed. The precise issue before the court was whether a "seizure" had occurred; the court concluded that it had. 489 U.S. at 598-99. The court went on, however, to observe:

> This is not to say that the precise character of the roadblock is irrelevant to further issues in this case. "Seizure" alone is not enough for § 1983 liability; the seizure must be "unreasonable." Petitioners can claim the right to recover for Brower's death only because the unreasonableness they allege consists precisely of setting up the roadblock in such a manner as to be likely to kill him. . . . Thus, the circumstances of this roadblock, including the allegation that headlights were used to blind the oncoming driver, may yet determine the outcome of this case.

*Id.* at 599. In other words, it was clear that the petitioners could recover—even though the death was accidental—if they could establish that the police had acted unreasonably in creating the danger.

That principle was reinforced in *Scott v. Harris*, 550 U.S. 372 (2007), a case involving a high-speed police chase of a fleeing suspect that ended in an accident, severely injuring the suspect. The court held that the claim of excessive force must be judged according to the objective reasonableness standard, and that the question turned on the police officer's actions leading up to the accident. 550 U.S. at 381-83. "Whether or not [the officer's] actions constituted application of 'deadly force,' all that matters is whether [his] actions were reasonable." *Id.* at 383.

Since *Brower*, every circuit court to consider the issue has concluded or at least suggested that the unintentional discharge of a firearm during a seizure can give rise to a Fourth Amendment claim if the officer's actions leading up to the shooting were objectively unreasonable. *See Henry v. Purnell* ("*Henry I*"), 501 F.3d 374, 382-83 (4th Cir. 2007); *Henry II*, 652 F.3d at 531-37 (4th Cir. 2011) (en banc); *Watson*, 532 Fed. Appx. at 457-58 (5th Cir. 2013); *Pleasant*, 895 F.2d at 276 (6th Cir. 1990); *Tallman*, 167 Fed. Appx. at 463-66 (6th Cir. 2006); *McCoy*, 342 F.3d at 848 (8th Cir. 2003); *Torres*, 524 F.3d at 1056 (9th Cir. 2008); *Bleck v. City of Alamosa*, 540 Fed. Appx. 866, 876-77 (10th Cir. 2013); *see also Speight*, 13 F. Supp. 3d at 1319 (N.D. Ga. 2013); *Owl v. Robertson,* 79 F.Supp. 2d 1104, 1114 (D. Neb. 2000); *Johnson v. City of Milwaukee*, 41 F. Supp. 2d 917 (E.D. Wis. 1999); *Sorenson*, 2011 WL 1990143 (D.

Minn. 2011).[5]  The First Circuit has not considered the precise issue, but has made a similar statement in dicta.  *See Landol-Rivera*, 906 F.2d at 796 n.9 (noting that "unintentional conduct triggering Fourth Amendment liability may occur when a police officer accidentally causes more severe harm than intended to an individual" during a seizure).

Although many of those decisions resulted in summary judgment for the police officer, in each case the court focused on the police officer's use and handling of the weapon under the circumstances presented.  *See Henry II*, 652 F.3d at 534-35 (mistaken use of firearm instead of Taser); *Watson*, 532 Fed. Appx. at 458 (decision not to reholster weapon before attempting handcuffing); *Pleasant*, 895 F.2d at 276-77 (decision not to reholster weapon before grabbing suspect); *Tallman*, 167 Fed. Appx. at 464-68 (decision to approach automobile passenger with weapon drawn and then to reach into vehicle); *McCoy*, 342 F.3d at 848-49 (decision to draw weapon); *Torres*, 524 F.3d at 1056-57 (mistaken use of firearm instead of Taser); *Bleck*, 540 Fed. Appx. at 871-73 (decision to attempt to restrain suspect with hands while holding weapon in one hand);  *Speight*, 13 F. Supp. 3d at 1321-23 (decision to draw gun and not reholster weapon); *Owl*, 79 F. Supp. 2d at 1112-14 (decision to draw the weapon and act of forcing suspect to the ground); *Johnson*, 41 F. Supp. 2d at 930 (decision to wrestle suspect to ground with weapon in hand); *Sorenson*, 2011 WL 1990143 (decision to wrestle suspect to ground with weapon in hand and finger insider trigger guard).

---

[5] A recent one-page unpublished Ninth Circuit opinion arguably provides the only exception. *See Powell v. Slemp*, 2014 WL 5139243 (9th Cir. Oct. 14, 2014).  In *Powell*, the Ninth Circuit held that a police officer who unintentionally discharged a gun while attempting to restrain a suspect was entitled to qualified immunity.  The court did not address whether an unintentional discharge of a firearm could lead to Fourth Amendment liability.  Instead, it jumped to the second prong of the qualified immunity analysis.  In finding qualified immunity, the court ruled that the case law must be clear that the officer's use of a firearm in the course of the restraint violated the Fourth Amendment, and concluded that "no such case law exists."  *Id.*  The court did not mention any of the relevant case law, including the prior published decision from the Ninth Circuit itself.  *See Torres*, 524 F.3d at 1056.  Accordingly, the *Powell* opinion, which was issued more than three years after the events at issue here, is in any event unpersuasive.

It is true that in 1987, the Second Circuit had ruled to the opposite effect, holding that an accidental discharge of a firearm during the handcuffing of a suspect could not, as a matter of law, lead to liability under § 1983.  *Dodd v. City of Norwich*, 827 F.2d 1, 7-8 (2d Cir. 1987) ("It makes little sense to apply a standard of reasonableness to an accident.").[6]  But it is highly doubtful whether *Dodd* remains good law.  Most importantly, it was decided before both *Brower* (in which the Supreme Court made clear that unreasonable conduct in the course of a seizure that results in an accidental death can give rise to liability, 489 U.S. at 599) and *Graham* (in which the Supreme Court held that all claims of excessive force in the course of a seizure should be analyzed under the Fourth Amendment and its "reasonableness standard," 490 U.S. at 395).[7]  After *Graham*, the law has been clear that it does not matter whether the police officer subjectively intended no harm—that is, whether it was an "accident," as opposed to an intentional infliction of harm.[8]  Instead, the question is whether the police officer's conduct was objectively reasonable.

In summary, in light of the Supreme Court precedent and the overwhelming weight of appellate authority, it was clearly established as of January 5, 2011, that an unintentional

---

[6] The *Dodd* court therefore did not consider whether the officer's actions leading up to the accident might have been unreasonable under the Fourth Amendment (although it did find those actions reasonable for purposes of a claim under state tort law).

[7] The *Dodd* court also concluded that the shooting was "not for the purpose of seizing [the suspect]," because for "all intents and purposes," the seizure of the suspect had "already taken place" by the time the police officer had begun to handcuff him, and before the firearm discharged.  827 F.2d at 7.  While it is clearly true that the firing of the weapon was not intended to effect the seizure, it is difficult to see how the court concluded that the seizure was over by the time the weapon discharged.

[8] Prior to the incident in this case, several district courts, mostly in the Third Circuit, had followed *Dodd* in cases involving police shootings, notwithstanding the Supreme Court's intervening opinions in *Brower* and *Graham*. *See Brice v. City of York*, 528 F. Supp. 2d 504 (M.D. Pa. 2007); *Clark v. Buchko*, 936 F. Supp. 212 (D.N.J. 1996); *Troublefield v. City of Harrisburg, Bureau of Police*, 789 F. Supp. 160 (M.D. Pa. 1992).  To the extent those decisions turn on the officer's subjective intent (that is, whether the shooting in question was an "accident") rather than the objective reasonableness of the officer's actions (that is, whether the officer's conduct, from an objective viewpoint, resulted in excessive force) they appear to be wrongly decided.

shooting during an intentional seizure can constitute excessive force if the officer's conduct leading to the accident was objectively unreasonable.[9]  Furthermore, it was well-established that the unsafe handling of a firearm during a seizure could constitute unreasonable conduct.

The remaining question is whether the law was clearly established "in light of the specific context of this case."  *Hunt v. Massi*, slip op. at 11.  In particular, the question is whether an objectively reasonable officer would know that his failure to observe safety precautions when pointing a loaded firearm at an innocent person who posed no threat could lead to a constitutional violation if the gun discharged as a result.

As noted, there are multiple cases holding that an officer can be found liable for an accidental shooting in the course of a seizure where the officer acted unreasonably while handling a firearm in the course of a seizure.  Nearly all of the reported cases involve a physical struggle with a criminal suspect who was resisting arrest, failing to comply with police orders, or attempting to flee.  *See, e.g., Henry II*, 652 F.3d at 524 (suspect was fleeing from police); *Watson*, 532 Fed. Appx. at 455 (suspect had refused to comply with police command and was resisting handcuffing); Speight, 13 F. Supp. 3d at 1304 (suspect had fled from police and was in the process of being handcuffed); *McCoy*, 342 F.3d at 842 (suspect, who was apparently intoxicated, had failed to stop for police); Pleasant, 895 F.2d at 273 (suspect was fleeing from police); *Torres*, 524 F.3d at 1054-55 (arrestee was becoming violent in back of patrol car).  Even in the *Tallman* case, which involved the shooting of an apparently innocent automobile passenger after a high speed car chase, the passenger had not responded to police commands, leading the officer to attempt a physical seizure that resulted in an accidental discharge of the

_____

[9] While some of the opinions noted were issued after 2011, the date of the incident, there were five relevant appellate opinions, in addition to *Brower*, *Scott*, and *Landol-Rivera,* by that point.

firearm.  167 Fed. Appx. at 461.

The parties and the Court have not found a case precisely identical to the present facts. That does not, however, preclude a finding that qualified immunity does not apply.  *See Hope v. Peltzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."); *Johnson*, 41 F. Supp. 2d at 930.  Here, the target of the seizure (Stamps) was not resisting arrest, refusing to obey orders, fleeing, or otherwise posing a threat to anyone.  Duncan's conduct was therefore, if anything, less justified than the conduct of the officers in the other reported cases.  An objectively reasonable police officer in Duncan's position would therefore have known that the decision to point the weapon at Stamps's head, with the safety off and his finger on the trigger and inside the guard, could result in a constitutional violation if he discharged the weapon without cause.

Perhaps the most appropriate way to frame the issue is to consider the principle that the objective reasonableness of an exercise of force is determined according to a balancing test—a test that weighs a variety of factors, such as the level of force used, the severity of the suspected offense, the danger posed by the subject, and whether the suspect is resisting arrest.  *See Graham*, 490 U.S. at 396-97.  Of course, every reported case involving excessive force turns on its own variable set of facts or circumstances, and therefore an individualized striking of the balance.  And officers making real-time decisions in the field will sometimes make honest mistakes or miscalculations as to how that balance ought to be struck, and the law provides considerable leeway for them to do so.  Nonetheless, there are surely instances where the balance tips so far in one direction that a reasonable police officer would clearly know that the force (or threat of force) was excessive.  Where the danger or threat posed by the subject—and as reasonably perceived by the police officer—is virtually non-existent, and the conduct of the

17

officer in the handling of a firearm creates a very high risk of death or serious injury, an objectively reasonable officer would know that his conduct was unreasonable. Put another way, at the extremes—an extremely low danger posed by the subject coupled with an extremely high risk created by the officer—any reasonable officer would know his conduct violated the Fourth Amendment.[10]

This is such a case. As noted above, Stamps presented no threat, whether actual, suspected, or perceived. He had not committed a crime, and he was not believed or suspected to be dangerous.[11] When Duncan encountered him, Stamps was in a vulnerable position, lying down on the floor with his hands up. He made no movement, sudden or otherwise. He was not resisting arrest or attempting to flee. Duncan nonetheless pointed a loaded firearm at his head—with the safety off and his finger inside the guard on the surface of the trigger. By doing so, he greatly increased the danger to Stamps with relatively little (if any) law enforcement justification. Thus, while it is true that each case turns on its own balancing of facts, none of those cases involved the relative extremity of factors presented here.

Under the circumstances, an objectively reasonable officer would have known that the combination of the lack of serious threat posed by the subject, the extremely high risk of harm from the firearm, and the unnecessary or unjustified nature of the police action rendered the officer's conduct unreasonable. The legal contours of the constitutional right in question had

---

[10] Suppose, for example, a police officer at a school crossing wanted to restrain a six-year-old girl from crossing the street when the traffic light was red. If he did so by pressing a loaded and cocked firearm against her temple, it would be clear that the display of force was excessive under the circumstances, because the proper balance of factors under *Graham* would be so obvious. That would be true even if no case had ever so held. If the police officer were jostled or bumped by another child and accidentally shot the girl, surely no court would find the officer immune on the ground that no case with similar facts had ever been brought.

[11] Again, the Framingham police had been advised that he posed no known threat during the execution of the warrant. (Pl. SMF ¶¶ 2, 6-7; *see* Duncan Dep. 21-25).

been clearly established at the time of the episode.  Therefore, the Court finds that defendant is

not entitled to qualified immunity, and the motion for summary judgment with respect to Counts

2 and 3 will be denied.

### b.       Fourteenth Amendment (Count 5)

Count 5 alleges violation of the Fourteenth Amendment Due Process Clause.  "[A]ll

claims that law enforcement officers have used excessive force—deadly or not—in the course of

an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the

Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due

process' approach."  *Graham*, 490 U.S. at 395.  Here, the excessive force claim arises in the

context of Duncan's seizure of Stamps.  Therefore, the Fourteenth Amendment Due Process

Clause does not apply, and defendant's motion for summary judgment as to Count 5 will be

granted.

### c.       Punitive Damages (Count 6)

Count 6 alleges that plaintiffs are entitled to punitive damages predicated on the Fourth

Amendment excessive-force violation.   To make a claim for punitive damages, plaintiff must

show that defendant's actions were "motivated by evil motive or intent" or involved "reckless or

callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56

(1983).   "Lack of intent to cause harm" does not automatically bar a claim for punitive damages.

*Hernandez-Tirado v. Artau*, 874 F.2d 866, 868 (1st Cir. 1989).  However, "[p]unitive damages

are reserved for instances where the defendant's conduct is 'of the sort that calls for deterrence

and punishment over and above that provided by compensatory awards.'"  *Id.* at 869 (quoting

*Smith*, 461 U.S. at 54).  "The Supreme Court, in articulating the standard for punitive damages in

§ 1983 actions, also referred to common law standards using such terms as 'injury . . . inflicted

maliciously or wantonly,' 'criminal indifference to civil obligations,' 'willful misconduct' or 'conscious indifference to consequences,' and 'outrageous conduct.'" *Id.* (citations omitted). Several courts have required a showing of "bad faith" by defendant or "ill will" or "malice" toward plaintiff. *Id.* (collecting cases).

Plaintiffs concede that Duncan accidentally fired his weapon. Therefore, his actions were not "motivated by evil motive or intent." In addition, plaintiff has presented no evidence that defendant acted outrageously, in bad faith, or with criminal indifference to civil obligations. Therefore, plaintiffs cannot prove that defendant acted with "reckless or callous indifference to the federally protected rights of others." Accordingly, defendant's motion for summary judgment with respect to Count 6 will be granted.

## 2. Wrongful Death (Count 8)

Count 8 alleges wrongful death under Mass. Gen. Laws ch. 229 § 2 on the basis that "[o]fficer Paul Duncan's shooting of Mr. Stamps was intentional in that he intended to pull the trigger and intended to cause physical harm to Mr. Stamps." (Am. Compl. ¶ 171).

Mass. Gen. Laws ch. 229 § 2 provides that a "person who (1) by his negligence causes the death of a person, or (2) by willful, wanton or reckless act causes the death of a person under such circumstances that the deceased could have recovered damages for personal injuries if his death had not resulted, . . . shall be liable in damages." As noted, Count 8 alleges intentional conduct on the part of defendant. However, that count fails because the undisputed evidence shows that defendant did not intend to shoot Stamps. (Def. SMF ¶ 27; Pl. SMF ¶ 32).

If Count 8 were construed to be a claim for negligence or recklessness instead, it would be barred because Duncan was a public employee. Under Mass. Gen. Laws. Ch. 258 § 2, "public employees are immune from suit based on allegedly negligent conduct. Rather, liability for the

negligent acts of a public employee committed within the scope of employment is visited upon the public employer, and not the employee." *Farrah ex rel. Estate of Santana v. Gondella*, 725 F. Supp. 2d 238, 246 n. 9 (D. Mass. 2010). For the purposes of this statute, "recklessness is considered negligent, rather than intentional conduct." *Id.* (quoting *Parker v. Chief Justice for Admin & Mgmt. of the Trial Court*, 67 Mass. App. Ct. 174, 180 (2006)). Count 9 alleges wrongful death against the City of Framingham based on Duncan's negligence. Therefore, defendant's motion for summary judgment with respect to Count 8 will be granted.

**B.** **Claims Against City of Framingham**

Defendants have moved for summary judgment on plaintiffs' claims against the City of Framingham for negligent training.

**1.** **Section 1983 Failure To Train (Count 7)**

Count 7 alleges that the Town of Framingham is liable under section 1983 for failing to train and supervise its officers. To establish municipal liability, a plaintiff must show that "the municipality itself causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 387 (1989); *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694-95 (1978). Thus, plaintiffs are required to demonstrate both the existence of a policy or custom and a "direct causal link" between that policy and the alleged constitutional deprivation. *City of Canton*, 489 U.S. at 385; *see also Monell*, 436 U.S. at 694 (policy must be the "moving force [behind] the constitutional violation"); *Santiago v. Fenton*, 891 F.2d 373, 381-82 (1st Cir. 1989). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011).

It is uncontested that the City of Framingham is a municipal entity subject to potential liability under section 1983. The claim for municipal liability rests principally on the city's alleged failure to train Duncan. A claim against a municipality under § 1983 is "most tenuous where [it] turns on a failure to train." *Id.* at 1359. To give rise to liability in such an action, "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id.* (quoting *Canton*, 489 U.S. at 388); *see also Young v. City of Providence*, 404 F.3d 4, 26-27 (1st Cir. 2005) (holding that, under *Monell*, "any proper allegation of failure to train . . . must allege that [the officer's] lack of training caused him to take actions that were objectively unreasonable and constituted excessive force" and that "the identified deficiency in [the training program was] closely related to the ultimate injury"). "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* at 1360 (quoting *Board of County Commissioners of Bryan County, Okl. v. Brown*, 520 U.S. 397, 410 (1997)). As a result, in order for plaintiff to demonstrate deliberate indifference for purposes of a failure to train claim, a "pattern of similar constitutional violations by untrained employees is ordinarily necessary." *Id.*

Plaintiffs contend that the Framingham Police Department's policies with respect to the use of a weapon's safety were grossly deficient and caused the fatal shooting of Stamps. (Pl. Opp. 30). Plaintiffs contend that "modern, up-to-date, and established law enforcement procedures require police departments to train their officers that weapons are to remain on safe until the officer is ready to fire at an object." (*Id.*). Framingham Police Department policy required that Duncan keep his weapon on safe unless he perceived a threat or was actively clearing a room. (PSMF ¶¶ 38, 78). Plaintiffs further contend that the policy was inadequate

22

because officers were not trained as to what constitutes a perceived threat. (*Id.* at ¶ 78). Plaintiffs contend that Stamps was not a threat, perceived or otherwise, and thus the failure to properly train Duncan caused him to turn his gun off safe mode. (*Id.* at ¶¶ 38-39, 78-80).

The bar for establishing "deliberate indifference" in connection with a failure-to-train claim is quite high, and plaintiffs have not met it here. Plaintiffs have put forth no evidence of any other incidents of police misconduct. Absent such evidence, the Court cannot find that failure to have a written policy as to what constitutes a perceived threat amounts to deliberate indifference. There is no evidence that the police department was on notice of the possible flaws in its policy. The issue is not whether the Framingham Police Department's policy is wise or sensible, or whether the Court might adopt something different. It is whether the policy, under the circumstances, amounted to deliberate indifference, and therefore a constitutional violation. With only one reported incident of misconduct related to the policy, any flaws do not rise to that level. Accordingly, defendant's motion for summary judgment with respect to Count 7 will be granted.

### 2.      Mass. Gen. Laws ch. 258 § 2 (Count 10)

Count 10 alleges that the Town of Framingham is liable under Mass. Gen. ch. 258 § 2 for negligent training and supervision of Duncan. The Massachusetts Torts Claims Act provides that "[p]ublic employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment." Mass. Gen. Laws. ch. 258 § 2. "Massachusetts cases have only allowed supervisory negligence claims against municipalities where the municipality knew or should have known about an underlying, identifiable tort, which was committed by named or unnamed public employees." *Kennedy v. Town of Billerica*, 617

F.3d 520, 533 (1st Cir. 2010). As noted, there is no evidence that the City of Framingham knew or should have known that Duncan was committing any kind of tort. Furthermore, the Massachusetts Torts Claims Act creates a cause of action based on the negligence of public employees. In Count 9, plaintiffs base a claim under this statute on Duncan's negligence. Here, there are no facts supporting a finding of negligence of public employees other than Duncan that can be imputed upon the City of Framingham.

Accordingly, defendant's motion for summary judgment with respect to Count 10 will be granted.

**IV.** **Conclusion**

For the foregoing reasons, defendant's motion for summary judgment is:

1. GRANTED with respect to Counts 1, 4, 5, 6, 7, 8, and 10.

2. DENIED with respects to Counts 2 and 3.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated: December 26, 2014              United States District Judge